

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-2003

# Ezeagwuna v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket 01-3294

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Ezeagwuna v. Atty Gen USA" (2003). *2003 Decisions.* Paper 592.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/592

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 14, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3294

GLORY OBIANUJU EZEAGWUNA,
Petitioner

v.

JOHN ASHCROFT, ATTORNEY GENERAL
OF THE UNITED STATES,
Respondent

On Petition for Review from an Order of the
Board of Immigration Appeals
(INS No. 0090-1:A76 142 746)

Argued April 25, 2002
Panel Rehearing Granted on April 14, 2003
Submitted After Grant of Panel Rehearing on
April 14, 2003

Before: BECKER, *Chief Judge*, SCIRICA, and
RENDELL, *Circuit Judges.*

(Filed: April 14, 2003)

Sidney S. Rosdeitcher, Esq.
Paul, Weiss, Rifkind, Wharton
 & Garrison
1285 Avenue of the Americas
New York, NY 10019-6084
*Counsel for Petitioner*
 *Glory Obianuju Ezeagwuna*

Michael T. Dougherty, Esq.
United States Department of Justice
Office of Immigration Litigation
1331 Pennsylvania Avenue, N.W.
Washington, DC 20530

Richard M. Evans, Esq.
Terri J. Scadron, Esq.
John M. McAdams, Jr., Esq.
Donald E. Keener, Esq.
Francis W. Fraser, Esq.
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Brian G. Slocum, Esq.
United States Department of Justice
1331 Pennsylvania Avenue, N.W.
Washington, DC 20530
*Counsel for Respondent
John Ashcroft, Attorney General
of the United States*

James C. La Forge, Esq.
Chadbourne & Parke
539 Valley Road
Upper Montclair, NJ 07043
*Counsel for Amicus-Appellant
Lawyers Committee for Human
Rights*

---

## OPINION OF THE COURT

---

RENDELL, *Circuit Judge*:

Glory Obianuju Ezeagwuna ("Ms. Obianuju"), a citizen of Cameroon, seeks political asylum and withholding of deportation. She claims to have been persecuted because of her membership in two political organizations in Cameroon that represent the interests of the English-speaking minority population. The Immigration Judge ("IJ") denied

her application, and the Board of Immigration Appeals ("BIA" or "Board") dismissed her appeal. The BIA also denied Ms. Obianuju's motion to supplement the record with four additional pieces of evidence.

The BIA's dismissal was based on a finding that Ms. Obianuju had submitted fraudulent documents and therefore was not credible. The BIA relied almost entirely on a letter from the Department of State that contained the conclusions of an investigation in Cameroon. In an original opinion on appeal, we concluded that reliance on this letter denied Ms. Obianuju her due process rights and undermined the fundamental fairness of the administrative process. *See Ezeagwuna v. Ashcroft*, 301 F.3d 116 (3d Cir. 2002). We also concluded that a reasonable factfinder would be compelled to conclude that Ms. Obianuju was persecuted because of her political opinions and faces a clear probability of persecution if returned to Cameroon. We then found Ms. Obianuju eligible for asylum and ordered withholding of deportation, subject to the Attorney General's discretion. Because we viewed the record as sufficient, we declined to consider whether the BIA abused its discretion in refusing to reopen the record and remand to the IJ for it to consider additional evidence proffered by Ms. Obianuju.

The Attorney General sought panel rehearing in light of the Supreme Court's opinion in *INS v. Ventura*, 123 S. Ct. 353 (2002), urging that the BIA, and not this Court, should make the determination as to whether, based on the record absent the documents we found unreliable, asylum and withholding of deportation should be granted. We agreed with this view and vacated our prior opinion and judgment. In so doing, while the analysis in our amended opinion remains unchanged regarding the documents that we found untrustworthy, we will now also address whether the BIA should have permitted Ms. Obianuju to supplement the record with the proffered additional evidence. Because the IJ has not had the opportunity to determine Ms. Obianuju's eligibility for asylum based on the appropriate evidence, we will grant the petition for review, and remand to the BIA for further proceedings consistent with this opinion.

I.

A. *Background*

Glory Obianuju Ezeagwuna, a citizen of Cameroon, seeks asylum in the United States. Prior to her alleged persecution she lived in Bamenda, a city in the Northwest Province of Cameroon. She is a member of the English-speaking minority population, French being the language of the majority. She claims to have been persecuted because of her political opinion, and she points to mistreatment resulting from her membership in two political groups representing the interests of this Anglophone population — the Social Democratic Front ("SDF") and the Southern Cameroons National Council ("SCNC").

Ms. Obianuju provided a detailed account of her abuse in affidavits, testimony, and corroborating documents. Following is a summary of the account presented by Ms. Obianuju in her affidavit in support of her application for asylum.

Ms. Obianuju's parents and other family members were very active members of SDF. In 1994, Ms. Obianuju began participating in SDF activities, and in 1996, at the age of eighteen, she became an official member of SDF. Ms. Obianuju tells of three times that she was jailed and physically abused because of her political activism. The first incident took place in 1996 when she joined other SDF members in protesting the appointment of Francis Faie Yengo as the leader of the Bamenda Urban Council. Government police sprayed tear gas on the protestors and arrested them. Ms. Obianuju claims that she was then dragged through the gravel on her knees and taken by force to Bamenda Central Prison where she was beaten on the soles of her feet and on her knees with police sticks. Ms. Obianuju's parents retained an attorney, Robert Nsoh Fon, to obtain her release from prison and on the fourth day she was released on bail. Upon her release she visited a doctor, Dr. Nji, who applied ointment to her hands and knees, and provided her with painkillers.

Next, in January 1997, Ms. Obianuju and other students marched to protest a substantial fee increase for taking a university entrance exam only imposed in the English-

speaking areas of Cameroon. Ms. Obianuju marched at the front of the group. The government police began beating the students with their belts and spraying tear gas in an effort to disperse the students. She was kicked in the stomach and then dragged by an officer through the gravel. In prison, she was further hit and kicked by the officers. Her attorney was able to negotiate her release from prison. After her release, Ms. Obianuju left the SDF and became a member of the SCNC. Although the SCNC did not hold demonstrations, its goals were otherwise similar to the SDF.

In March and April 1997 there were a series of attacks on police and civilian establishments in Bamenda. According to Ms. Obianuju, the government blamed the SCNC for the attacks, but she denies any involvement. Ms. Obianuju claims that a few weeks after the attacks the police entered her home at 10 p.m. while she was asleep and physically removed her from her home without providing any explanation. During the course of the family's struggle to protect her, a police officer cut her mother's hand with a knife. Ms. Obianuju was taken to prison and placed in a cell with other SCNC members where she remained for six days. During the first day she and the others were beaten with police sticks on the soles of their feet and on their knees. During the second day an officer removed her from her cell and attempted to rape her, but was stopped by another officer. He bit her on the chest and scratched her back with his nails, leaving scars. She was repeatedly kicked in the stomach and hit across her face during the remainder of her detention. When her lawyer sought her release, he was told that she was being imprisoned for the March and April attacks mentioned above. On April 30, she was released upon payment of 1,500,000 francs.

Upon release she was taken to a doctor, because she was discharging blood. She subsequently became more ill and underwent an emergency appendectomy because her appendix "had been destroyed" by the abuse she suffered. She remained in the hospital for thirty days thereafter.

On July 31, 1997, Ms. Obianuju's attorney informed her that the police had a warrant for her arrest claiming that she had been improperly released in April. She therefore

traveled to Bafut, a city in the Northwest province, to stay with a family friend, George Moma. She remained in hiding there indoors until December 1998. She then obtained a fake passport in the name of George Moma's sister, Francisca Biwie Moma. She used this passport to fly to Jamaica in February 1999. She stayed with a series of new acquaintances in Jamaica for three weeks. At that time her return trip was scheduled, and she requested asylum from the Jamaican immigration office, but they denied her application and attempted to take her into custody. She again went into hiding. A Jamaican provided her with a fake English passport in the name of Rebecca Channon, and she left on a flight to Newark, New Jersey on August 13, 1999. Upon her arrival at Newark International Airport, United States immigration officers determined that the passport was false, and upon questioning by the INS, Ms. Obianuju sought political asylum. Ms. Obianuju was deemed inadmissible by the INS under sections 212(a)(6)(C)(i)[1] and 212(a)(7)(A)(i)(I)[2] of the INA ("Immigration and Nationality Act") because she entered the country with invalid documents, and she was detained and has remained in detention ever since. She seeks political asylum and withholding of deportation, and, in the alternative, relief under the Convention Against Torture ("CAT").[3] She claims that Cameroonian authorities continue to look for her and believes that her well-being and even her life would be in jeopardy if she returned to Cameroon.

B. *Proceedings Before the INS*

Ms. Obianuju first appeared before the Immigration

---

1. "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible." 8 U.S.C. § 1182(a)(6)(C)(i).

2. A person is inadmissible if she "is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter. . . ." 8 U.S.C. § 1182(a)(7)(A)(i)(I).

3. As the relief provided by the CAT is subsumed by the relief provided by the grants of asylum and withholding of deportation, we will not address whether she qualifies for relief under the CAT.

Judge ("IJ") on September 2, 1999 pro se. She subsequently obtained counsel, and a hearing on the merits was held first on March 3, 2000 and continued on May 9, 2000. Ms. Obianuju testified at great length and was cross-examined by INS counsel, Irene Feldman. Ms. Obianuju submitted a large number of corroborating documents, including affidavits and declarations of family, friends, and SDF members, SDF membership cards, and U.S. State Department Country Reports. At the time of the hearing, the IJ had before her 37 exhibits provided by Ms. Obianuju and the INS. Dr. David S. Kang, a family medicine practitioner who conducted a physical examination of Ms. Obianuju on November 9, 1999, testified on her behalf. He concluded that she was credible, in part because she did not claim that every scar on her body resulted from torture. Furthermore, the scars she claimed were caused by torture were consistent with the acts she claimed caused them, specifically, scars on her knees from being dragged through the gravel, a scar on her chest from being bitten, and a surgical scar on her abdomen resulting from her appendectomy. Ms. Obianuju also moved to admit Dr. Kang's affidavit. At the close of this hearing the IJ said:

> I have spoken with, to both counsels. I need to, this matter has to be continued, of course, for the issuance of the oral decision. And of course Ms. Feldman is waiting response of the [forensic document laboratory] report regard, as to one document just recently submitted. Therefore, this hearing is adjourned for the 26th of May, at 1 p.m. in the afternoon.[4]

On June 7, 2000, during a continuance of the May 26 hearing, the INS provided a two-page letter from John Larrea, Vice Consul of the Embassy of the United States in Yaounde, Cameroon (the "Larrea letter"). The Larrea letter sets forth in a summary fashion the results of an investigation conducted into five documents submitted by

---

4. In support of her motion to reopen, Ms. Obianuju claims that this statement by the IJ closed the record. We must disagree and find that the record did not close until the IJ explicitly said so on September 21, 2000. This is further evidenced by the fact that both parties submitted new evidence in support of motions after the May hearing.

Ms. Obianuju: a medical certificate from her doctor in Cameroon; the arrest warrant; an application for bail; an affidavit by Ms. Obianuju's father; and, an affidavit by her attorney in Cameroon, Robert Nsoh Fon. The letter concludes that each of these documents is fraudulent. A copy of each document is attached to the Larrea letter with notations allegedly made by government officials setting forth why the document is believed to be fraudulent. No investigative report is provided, nor is there any information about the investigation or the investigator.

In order to respond to the letter, on June 16, 2000, Ms. Obianuju's counsel requested a 30-day continuance. She explained: "An additional 30 days would enable us to address the allegations in the June 7, 2000 letter from the United States Embassy concerning Ms. Obianuju's asylum application, and make any necessary motions with regard to the findings in that letter." The continuance was granted.

On July 27, 2000, Ms. Obianuju filed a motion in limine setting forth five reasons why the Larrea letter should be excluded: 1) no foundation was laid for Larrea's opinions, 2) the letter's admission would violate the due process requirement of fundamental fairness; 3) its admission would violate INS regulations prohibiting the disclosure of asylum applications to third parties; 4) the admission of evidence based on this type of investigation would frustrate future asylum proceedings; and, 5) the letter was not authenticated in accordance with INS regulations. As support for the motion, Ms. Obianuju included a July 26, 2000 affidavit from Milton Krieger, a scholar of politics in Cameroon ["first Krieger affidavit"].[5] Dr. Krieger shared his detailed knowledge of Cameroon, particularly regarding the government's persecution of SDF and SCNC members, the U.S. Embassy's limited knowledge of the political situation in Bamenda, and the difficulty of authenticating documents in Cameroon. Finally, he explained that Ms. Obianuju's

---

5. Milton Krieger has spent many months in Cameroon studying its political system. Since 1989 he has been to Cameroon four times and stayed there each time for between four and ten months. He is the author of *African State and Society in the 1990s: Cameroon's Political Crossroads* (Joseph Takougang co-author, 1998).

account of what occurred was credible and shared his opinion that if she returned there was "a significant probability that Ms. Obianuju would be severely harassed, beaten, tortured or possibly even killed."

On August 7, 2000, the INS moved for a continuance of the hearing set for August 9 in order to obtain an original of the Larrea Letter. On that very same day, August 7, counsel for the INS obtained a letter from Marc J. Susser, Director, Office of Country Reports and Asylum Affairs, United States Department of State (the "Susser letter"). The entire text of the Susser letter is set forth in the appendix to this opinion. Susser explained in his opening paragraph: "I am writing to forward the results of an investigation, by a Foreign Service post, of documents presented in support of the asylum application of [Glory Obianuju]. These documents were forwarded to us by your office." The Susser letter is simply a restructured version of the Larrea letter, utilizing almost the exact same language. Significantly, however, the referenced documents are *not* attached to the Susser letter.

Although the Susser Letter is dated August 7, 2000, it was not provided to the IJ or Ms. Obianuju's counsel until September 18, 2000, three days before the hearing date.[6] On September 18, the INS sent a letter to the IJ as a response to Ms. Obianuju's motion in limine. In addition to rebutting the arguments made in the motion in limine, the INS provided the Susser letter "since [Ms. Obianuju] has objected to the admissions of the letter from John Larrea." The INS contended:

> In an effort to provide Your Honor with an original letter, the Service respectfully submits the more recent Department of State letter in lieu of the prior submission. To date, the Service has not received the original copy of the Larrea Letter. Although the respondent has questioned the integrity of the Embassy staff, it would be beyond the realm for the respondent to question the recent letter submitted by

---

6. Ms. Obianuju's counsel claims not to have received the letter until September 19, 2000.

Marc J. Susser, Director of the Office of Country Reports and Asylum Affairs.

The INS, therefore, no longer sought to admit the Larrea letter nor did it submit copies of the allegedly fraudulent documents for consideration as part of the record. It only moved for admission of the two-page Susser letter.

On September 21, 2000, the day of the hearing, counsel for Ms. Obianuju presented the IJ with a letter expressing her objections to the Susser letter, primarily reiterating the concerns set forth in the motion in limine. On September 21, the IJ heard from both counsel regarding the admissibility of the Susser letter and other documents. As the INS no longer sought admission of the Larrea letter, it was marked for identification purposes only. Without any explanation, the IJ admitted the Susser letter over Ms. Obianuju's objections. The IJ closed the record at this hearing.[7]

On October 30, 2000, the IJ issued a written opinion. The IJ found that Ms. Obianuju had not established that she suffered past persecution or a well-founded fear of persecution, and therefore denied her applications for asylum, withholding of removal, and relief under the Convention Against Torture. The IJ's decision was based almost entirely on its finding that Ms. Obianuju was not credible. First, the IJ said that Ms. Obianuju's testimony seemed exaggerated and rehearsed. Second, the IJ believed that details of her testimony "simply did not add up." She pointed specifically to the implausibility of Ms. Obianuju's explanation for discrepancies with her membership cards, that she was repeatedly mistreated by officers in exactly the same manner, and that the government would search so actively for a girl who was only moderately involved in political activity. Third, the IJ found that several reports

7. "The record is closed, but for the decision of the Court. Understood, counsels? I will accept no further documents unless there's a showing that this document was unavailable, and is germane to the case, and it was unavailable at the, and it was clearly unavailable, and this clearly this document is extraordinary, and would clearly substantiate the respondent's claim. So the record is closed but for the submission, the issuance of the decision."

provided by the INS questioned the authenticity of documents submitted by Ms. Obianuju, as well as the veracity of her testimony. Specifically, the IJ pointed to the Susser letter, the INS Forensic Document Laboratory ("FDL") report questioning the authenticity of one SDF card, and a document entitled "Abuse of Membership of the Social Democratic Front by Asylum Seekers" prepared by the SDF in Cameroon. Finally, the IJ explained that it was unbelievable that a person in her position would be the subject of the persecution she claimed.

Ms. Obianuju filed an appeal with the Board of Immigration Appeals on November 27, 2000. On July 10, 2001, Ms. Obianuju filed a motion to supplement the record for her asylum application. She asked the BIA to consider three additional documents that were not part of the record before the IJ: an affidavit of Sister Jane Mankaa, a Cameroonian nun living in New Jersey who visited Ms. Obianuju's parents in August 2000; a second affidavit of Dr. Milton Henry Krieger commenting in part on Sister Mankaa's affidavit; and, an affidavit of Dr. Frances Geteles, a certified clinical psychologist who examined Ms. Obianuju in July 2001. All three affidavits provide support for Ms. Obianuju's version of events and bolster her credibility. Ms. Obianuju also asked the BIA to consider a June 21, 2001 memorandum from Bo Cooper, General Counsel to the INS. Cooper set forth the proper procedure to follow when conducting overseas investigations in order to ensure the confidentiality of the asylum applicant. Ms. Obianuju offered the letter as support for her argument on appeal that the confidentiality of her application was breached by the investigation reflected in the Susser letter.

Without oral argument, the BIA issued its decision on August 17, 2001. The BIA first denied Ms. Obianuju's motion to supplement the record. It explained: "[T]he Board is an appellate body whose function is to review, not create a record. Thus it would be inappropriate for us to accept the evidence proffered by the respondent." (citation omitted). The BIA also refused to remand to the IJ for it to consider the additional evidence, because, with the exception of Dr. Geteles's affidavit, it was "not shown that the affidavits could not have been presented on or before

close of the hearing on the merits which was concluded on September 21, 2000." The BIA further found that Dr. Geteles's affidavit would not change the outcome in the case and therefore did not merit reopening the record.

The BIA then conducted a de novo review of the record, found that the IJ's decision was correct, and dismissed the appeal. In the course of its analysis, however, the BIA disagreed with much of the IJ's reasoning, specifically two of the primary grounds on which the IJ relied when concluding that Ms. Obianuju was not credible. The BIA explained: "We disagree with the Immigration Judge that it is implausible that the respondent may have been abused on different occasions in similar ways or that as a rank and file member of the SDF she would not have been subject to custodial abuse." The BIA also found that the IJ's description of Ms. Obianuju's testimony did not reflect whether her demeanor was a result of rehearsal, as the IJ concluded, or instead "related to the respondent's repetition of stressful events in different venues with resulting emotional numbness." The BIA concluded: "Consequently, to the extent that the Immigration Judge's decision is based upon finding these accounts of the respondent incredible solely based upon their implausibility and/or the manner in which the testimony was provided, we disagree with the Immigration Judge."

The remainder of the BIA's decision focused on the allegedly fraudulent corroborating documents submitted by Ms. Obianuju based on the "investigation" results set forth in the Susser letter. The BIA concluded that the Susser letter was properly admitted and considered by the IJ. The BIA essentially adopted the conclusions of the Susser letter and concluded that the five pieces of evidence discussed therein were fraudulent: the medical certificate from her doctor in Cameroon; the arrest warrant; the bail application; the affidavit of Ms. Obianuju's father; and the affidavit by her attorney in Cameroon, Robert Nsoh Fon. The BIA also concluded that one of the SDF membership cards she submitted was fraudulent because of the discrepancy between the dates of contribution, beginning in 1991, and the date she claims to have joined, in 1996. The BIA specifically rejected Ms. Obianuju's explanation,

supported by affidavits of SDF members, regarding the practice of backdating membership cards when a member paid dues for previous years.

The BIA's finding that the evidence described in the Susser letter was fraudulent was the linchpin of its decision:

> In essence, there is a pattern in the evidence consistent with the repeated fabrication of identities for individuals signing documents presented by the respondent and this pattern is reinforced by stamps on affidavits which appear to be fake and the failure to register documents in the High Court of Bamenda as required. We find this pattern consistent with the production of counterfeit evidence as opposed to the administrative lapses and corruption described by the respondent or intentional efforts to discredit her persecution claim.

The BIA focused on Ms. Obianuju's submission of fraudulent documents, and not the substance of the evidence supporting Ms. Obianuju's claims:

> We find that the respondent's failure to meet the burden of proving eligibility for relief is directly related to the adverse credibility determination and the presence of counterfeit evidence presented in an attempt to corroborate the respondent's account. It is the presentation of counterfeit documents to bolster her claim, rather than the failure to present any specific supporting evidence, which has resulted in the failure of proof.

Notwithstanding its concerns regarding the IJ's analysis, the BIA ultimately reached the same conclusion and rejected Ms. Obianuju's application due to her lack of credibility, although based on the submission of falsified documents. The BIA concluded:

> Despite the fact that we do not agree with all aspects of the Immigration Judge's decision, we see no reason to disturb the adverse credibility determination. We find that the respondent's efforts to explain and/or rebut the findings of United States officials are

> inadequate and that such counterfeit corroborative evidence discredits not only the specific evidence itself, but indicates an overall lack of credibility regarding the entire claim. As the adverse credibility determination is dispositive for purposes of eligibility, the respondent's appeal from the denial of her applications for asylum, withholding of removal, and relief under the CAT is dismissed.

(citations omitted).

Ms. Obianuju then filed this petition for review.

## II.

We have jurisdiction to review the BIA's final order pursuant to 8 U.S.C. § 1252(a)(1). The BIA had jurisdiction under 8 C.F.R. § 3.1(b)(9). As it conducted an independent analysis of the record, we limit our review to the BIA's final order. *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001). Our analysis of the order will proceed in two parts. First, we will review de novo whether Ms. Obianuju's due process rights were violated. *Chong v. INS*, 264 F.3d 378, 386 (3d Cir. 2001). Next, we will consider whether the BIA abused its discretion in refusing to reopen the record and remand to the IJ for it to consider supplemental evidence. *Lu v. Ashcroft*, 259 F.3d 127, 131 (3d Cir. 2001).

A. *Reliance on Susser Letter Violated Ms. Obianuju's Due Process Rights*

We must first consider Ms. Obianuju's challenge to the BIA's consideration of the Susser letter. This is a crucial, threshold consideration, because, as we noted, the BIA's decision was based almost entirely on the Susser letter, and it is clearly the underpinning for the BIA's conclusion that Ms. Obianuju's testimony was not credible and that her corroborative evidence was fraudulent. Without the Susser letter, the majority of the BIA's reasoning actually supports Ms. Obianuju's case. Because we believe that the BIA's reliance on the letter violated her Fifth Amendment right to due process, we need not address Ms. Obianuju's other challenges to the letter.

Due process protections are afforded to aliens facing removal. *See, e.g.*, *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001) ("Despite the fact that there is no constitutional right to asylum, aliens facing removal are entitled to due process."); *Chong v. INS*, 264 F.3d 378, 386 (3d Cir. 2001) ("Aliens facing removal are entitled to due process."). Because the Federal Rules of Evidence do not apply in asylum proceedings, "[t]he test for admissibility of evidence . . . is whether the evidence is probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Bustos-Torres v. INS*, 898 F.2d 1053, 1055 (5th Cir. 1990); *see Lopez-Chavez v. INS*, 259 F.3d 1176, 1184 (9th Cir. 2001) ("The sole test governing the admission of evidence in deportation proceedings is whether the evidence is probative and its admission is fundamentally fair.") (quotation omitted). As the Court of Appeals for the Second Circuit has explained: "In the evidentiary context, fairness is closely related to the reliability and trustworthiness of the evidence." *Felzcerek v. INS*, 75 F.3d 112, 115 (2d Cir. 1996). Therefore, our analysis as to whether an individual's constitutional rights are violated turns on whether the evidence considered by the BIA is reliable and trustworthy. For the reasons discussed below, we find that the admission of the Susser letter violated Ms. Obianuju's due process rights.

Succinctly stated, the Susser Letter does not satisfy our standards of reliability and trustworthiness. Initially, we are troubled by the dates of the INS's procurement of the Susser Letter and the timing of its being provided to Ms. Obianuju's counsel and the IJ a few days before the final hearing. As we noted above, the date that INS counsel requested an extension in order to obtain the original of the Larrea letter — August 7, 2000 — is the very same date that appears on the Susser letter. However, the INS only provided the Susser letter to the IJ and Ms. Obianuju's counsel nearly six weeks later, on September 18, 2000, when it sought to introduce it into evidence as a replacement for the Larrea letter which was ultimately marked for identification purposes only. Furthermore, Susser noted in his August 7 letter: "These documents were forwarded to us by your office."

Second, although hearsay can be admitted in asylum cases under certain circumstances, *see, e.g., Kiareldeen v. Ashcroft*, 273 F.3d 542, 549 (3d Cir. 2001), reliance on such evidence here raises the precise concerns that are fundamental to its general inadmissibility in civil proceedings, and raises concerns that it is not fundamentally fair. As we have previously explained: "Hearsay is generally inadmissible because the statement is inherently untrustworthy: the declarant may not have been under oath at the time of the statement, his or her credibility cannot be evaluated at trial, and he or she cannot be cross-examined." *U.S. v. Reilly*, 33 F.3d 1396, 1409 (3d Cir. 1994) (quotation omitted). Although the Federal Rules do not apply in this case, exceptions set forth in the Rules focus on trustworthiness, further indicating why we regard hearsay with a level of suspicion. *See, e.g.*, Fed. R. Evid. 803(6)-(8) ("Hearsay Exceptions; Availability of Declarant Immaterial"); Fed. R. Evid. 804(b)(3) ("Hearsay Exceptions; Declarant Unavailable"); Fed. R. Evid. 807 ("Residual Exception").

The Susser letter is multiple hearsay of the most troubling kind. It seeks to report statements and conduct of three declarants who are far removed from the evidence sought to be introduced. They are purportedly individuals who told the investigator that certain aspects of the documents appeared to be fraudulent. Not only does Susser have no direct knowledge of the investigation, he did not even directly communicate with John Larrea, the declarant whose hearsay statements he is repeating. Therefore, the current speaker — Susser — was unable to even evaluate the credibility of the immediate preceding declarant — Larrea — who of course was himself only a proponent of hearsay. Further, we do not know whether Larrea had any interaction with "the investigator," only referred to as "she," who reports to Larrea what others have purportedly told her. Given that the consul is in Yaounde and the investigation necessarily took place in Bamenda, it seems entirely possible that Larrea's sole source for the hearsay statements was the notations written on the document. Therefore, Larrea would also have been unable to judge the credibility of the investigator, also a proponent of hearsay. Therefore, Susser was three steps away from the actual

declarants; all we know about the two individuals who have forwarded these written statements is that one is a Cameroonian Foreign Service National who conducted "an investigation" for the U.S. Embassy in Cameroon and the other is John Larrea, who worked as Vice Consul for the U.S. Embassy in Cameroon but now, according the INS, cannot be located by the Government.[8]

A comparison of the letters shows that Susser simply repeated Larrea's representations with slight variations in sentence construction, bolstering the conclusion that Susser's knowledge of the investigation was limited solely to the Larrea letter itself.[9] Consideration of the first representations, regarding the medical certificate, is illustrative. Larrea explained:

> The Director of Administrative Affairs in the Provincial Hospital of Bamenda told us that no doctor named Chefor James N. has ever worked at the hospital. He added that there is no medical record at the hospital for Glory Obianuju and the round stamp and the form used for the Medico-Legal Certificate are fake. It is our conclusion that this document is fraudulent.

Susser similarly stated:

> Regarding the Medico Legal Certificate, the Director of Administrative Affairs in the Provincial Hospital of Bamenda stated that the round form and the stamper used for the Certificate are fake, and that there is no medical record at the hospital for Glory Obianuju. He also noted that no doctor by the name of James N. Chefor has ever worked at the hospital. The

8. While counsel for Ms. Obianuju suggested that Embassy personnel often had pressures on them which could lead to less than accurate reports, and the INS contends that these individuals would not risk their jobs to undermine an asylum application, we make no judgment regarding the veracity or motives of these individuals. Our analysis is based not on these aspects, but on the information the BIA had before it when it based its decision on the Susser letter.

9. The Susser letter does not recite Larrea's statement that he "does not believe that any claims for asylum in recent years based upon political beliefs or SDF membership have any merit." Larrea's statement is in direct conflict with the State Department Country Reports on Cameroon.

> investigator in the U.S. Embassy in Yaounde, Cameroon, concluded that this document is fraudulent.

Susser provided no information in his letter which was not already stated in almost the precise same words in the Larrea letter. The INS has not contended before us or the BIA that Susser has any personal or even second-hand knowledge of the investigation. His knowledge is limited to the Larrea letter which was not even sought to be admitted in this case because of the INS's inability to obtain the original.

Third, we are concerned that the INS is attempting to use the prestige of the State Department letterhead to make its case and give credibility to the letter's contents. As we have previously noted,

> the Board's decisions cannot be sustained simply by invoking the State Department's authority. We are expected to conduct review of the Board's decisions, and that procedural safeguard would be destroyed if the Board could justify its decisions simply by invoking assertions by the State Department that themselves provide no means for evaluating their validity. *See Galina v. INS*, 213 F.3d 955, 958-59 (7th Cir. 2000). The Board cannot hide behind the State Department's letterhead.

*Li Wu Lin v. INS*, 238 F.3d 239, 246 (3d Cir. 2001). This seems to be precisely what the INS intended to do in this case, as it explained: "Although the respondent has questioned the integrity of the Embassy staff, it would be beyond the realm for the respondent to question the recent letter submitted by Marc J. Susser, Director of Office of Country Reports and Asylum Affairs."

Fourth, partially due to the multiple levels of hearsay involved here, we have absolutely no information about what the "investigation" consisted of, or how the investigation was conducted in this case.[10] In combination

---

10. The Lawyers Committee for Human Rights filed an amicus curiae brief arguing that we should rule the Susser letter inadmissible because

with the concerns we note above, we believe that the complete dearth of information about the investigator or the investigation undermines the Susser letter as not only untrustworthy, but also unhelpful. Further adding to our concern, Dr. Milton Krieger, a scholar of politics in Cameroon, expressed his belief "that it is very difficult to prove and/or disprove the authenticity of documents created in Cameroon since political tensions and administrative lapses and corruption intensified in the early 1990s." We also agree with Ms. Obianuju's contention that the persons contacted provided only indirect attacks as to the genuineness of the documents. For instance, rather than locate the individual who supposedly signed the warrant, or confirm through authorities that such person existed, the investigator presented the warrant to a different magistrate who states: "After a thorough search in my chambers, I have not been able to get any trace of evidence that a warrant of arrest was ever issued." JA41. There is no reason to expect that the warrant would be in this magistrate's chambers.

We have previously expressed concern about the BIA's attributing significance to activities such as interviews at airports when it lacked key information regarding the manner in which interviews were conducted. *Balasubramanrim v. INS*, 143 F.3d 157, 164 (3d Cir. 1998); *Senathirajah v. INS*, 157 F.3d 210, 216 (3d Cir. 1998). Although we did not consider whether there was a due process violation in those cases, we did conclude that the BIA's adverse credibility determination was faulty because the airport interviews were not "valid grounds upon which to base a finding that the applicant [was] not credible." *Balasubramanrim*, 143 F.3d at 164 (quotation omitted); *see Senathirajah*, 157 F.3d at 216. In *Balasubramanrim*, we noted that we did "not know how the interview was conducted or how the document was prepared." 143 F.3d at

---

the confidentiality of Ms. Obianuju's asylum application was violated by the investigation. We agree that the guarantee of confidentiality is significant, but the issue in this case is resolved by the violation of Ms. Obianuju's due process rights and therefore we do not reach this argument.

162. In *Senathirajah*, relying in large part on our reasoning in *Balasubramanrim*, we likewise were troubled by the interview because "[t]he government offered no testimony as to the circumstances under which that affidavit was obtained." 157 F.3d at 218. The manner of eliciting such information is crucial to their probative value. Similarly, here, the nature of the purported "investigation" is a matter of pure conjecture and can provide no basis for a finding of falsification on the part of Ms. Obianuju.

We find that the BIA violated Ms. Obianuju's due process rights by basing its credibility finding almost entirely on the Susser letter, because it appears neither reliable nor trustworthy. As in *Lin*, *Balasubramanrim*, and *Senathirajah*, "[t]he Board's performance in this case was less than it should have been." *Lin*, 238 F.3d at 248. Accordingly, on remand, the BIA must consider the record before it absent the Susser letter.

B. *Additional Evidence*

We next consider whether the BIA abused its discretion in denying Ms. Obianuju's motion to reopen the record and remand to the IJ for it to consider four additional pieces of evidence: an affidavit of Sister Jane Mankaa, a nun who visited Ms. Obianuju's parents in Cameroon in August 2000; an affidavit of Dr. Milton Henry Krieger discussing the reliability of Sister Mankaa's affidavit; a psychological evaluation of Ms. Obianuju by Dr. Frances Geteles; and a June 2001 memorandum from Bo Cooper, General Counsel to the INS, setting forth the proper procedure to follow in overseas investigations to ensure the confidentiality of the asylum applicant. We find that the BIA did not err in finding that the affidavits of Sister Mankaa and Dr. Krieger could have been presented on or before the close of the record, and thus not permitting their consideration, but that it did abuse its discretion in determining that Dr. Geteles's psychological evaluation was not material and should not have been considered by the IJ. We will therefore remand to the BIA for it to reopen the record and remand to the IJ for consideration of the psychological evaluation. Finally, we conclude that the Cooper memo, which related to the investigation referenced in the Susser

letter, is no longer material, and accordingly we will not require the BIA to allow its submission.

"A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 3.2(c)(1). We review the BIA's denial of the motion to reopen for abuse of discretion, "mindful of the 'broad' deference that the Supreme Court would have us afford." *Lu v. Ashcroft*, 259 F.3d 127, 131 (3d Cir. 2001) (citing *INS v. Abudu*, 485 U.S. 94, 108 (1988)).

The BIA denied Ms. Obianuju's motion to reopen to present additional evidence on the grounds that she had not proven that Sister Mankaa's affidavit, Dr. Krieger's affidavit, and the Cooper memo "could not have been presented on or before the close of the hearing on the merits which was concluded on September 21, 2000." The BIA found that the psychological evaluation could not have been presented prior to the close of the record, but that "there is other evidence of record of the respondent's medical examination in the United States," and that "in view of the basis of [its] disposition of this case, it does not appear that evidence of psychological evaluation subsequent to the immigration hearing would change the outcome."

First, we find that the BIA did not abuse its discretion in finding that Sister Mankaa's and Dr. Krieger's affidavits could have been presented prior to the close of the record. Because Dr. Krieger's affidavit is an evaluation of Sister Mankaa's affidavit, the time frame for the Sister's affidavit governs both pieces of evidence. That is, if her affidavit could have been presented prior to the close of the evidence, then so could his. We will therefore address these two affidavits together.

Sister Mankaa's affidavit was taken in support of Ms. Obianuju's parole application of May 17, 2001. The affidavit itself is not dated. In her affidavit, Sister Mankaa states that she learned of Ms. Obianuju's detention from a friend and visited Ms. Obianuju at her detention center in New Jersey before Ms. Obianuju was transferred to a detention

center in New York. After that, she and Ms. Obianuju were in "regular contact by mail." She then states that she went home to Cameroon in August 2000 and visited Ms. Obianuju's family there. She details what Ms. Obianuju's parents told her about the persecution Ms. Obianuju would face if she returned home. Nowhere in the affidavit does Sister Mankaa state when she returned from Cameroon.

Ms. Obianuju contends that she could not have presented this evidence before September 21, 2000 because she and her counsel did not learn of that trip until several months later. The government argues that the affidavit does not meet the threshold requirement of establishing its unavailability at the hearing because it does not contain any information as to when the affidavit was taken or when the Sister returned to the United States.

We agree with the government's position and find that the BIA did not abuse its discretion in finding that these affidavits could have been presented prior to the close of the record. The BIA was provided with a document that did not contain any dates except to state that the trip occurred in August 2000, prior to the close of the record. Since Sister Mankaa states that she and Ms. Obianuju were in "regular contact," it was within the realm of discretion for the BIA to conclude that Ms. Obianuju could have found out about the trip and presented the information. Although it is true that this affidavit, and Dr. Krieger's, were presented in response to the Susser letter, which Ms. Obianuju did not have until three days prior to the final hearing, Ms. Obianuju had been in possession of the Larrea letter since June 2000, which contained almost exactly the same contentions. Ms. Obianuju therefore was on notice that her credibility and the legitimacy of her claim were being challenged.[11]

---

11. While we do not find that the BIA was required to reopen the record to allow the IJ to consider Sister Mankaa's and Dr. Krieger's affidavits, we note that, on remand, the IJ may wish to consider these affidavits so that he has a fully developed record on which to rest his ruling. *See Jacinto v. INS*, 208 F.3d 725, 733 (9th Cir. 2000) (immigration judge, like administrative law judge in social security cases, has a duty to fully develop the record).

However, we find that BIA did abuse its discretion in denying the motion as to the psychological evaluation. The BIA found that the report could not have been presented earlier, but that it was duplicative of a previous medical report and would not change the outcome. *See Matter of Coelho*, 20 I.&N. Dec. 464 (BIA 1992) ("if we conclude that our decision on the appeal would be the same even if the proffered evidence were already part of the record on appeal, we will deny the motion to remand").

We find that the psychological evaluation is material and not simply repetitive of the other medical evidence. The "other evidence" that was in the record consists of a four page medical report by Dr. Kang, a family doctor who has received specialized training in documenting and treating victims of torture. The psychological components of the report include two statements about Ms. Obianuju's psychiatric state and a conclusion that her explanation of events was consistent and that she was most likely telling the truth. The report also concludes that a physical exam was consistent with her story.

The psychological evaluation Ms. Obianuju seeks to submit was conducted by Dr. Geteles, a clinical psychologist who has also received special training in the detection and documentation of torture. Her seven page report contains two pages of "Psychological Assessment," including a diagnosis of Post Traumatic Stress Disorder and Major Depressive Disorder, and the doctor's conclusion that Ms. Obianuju "possesses a psychiatric profile consistent with and strongly corroborative of her claim that she was the victim of persecution and continues to suffer the effect of those experiences." This report adds new, material information beyond what was contained in Dr. Kang's report.

Because we see no need to question the BIA's finding that the information could not have been presented prior to the close of evidence, but find that the evaluation is material, we will remand to the BIA with instructions to reopen the record and remand to the IJ for consideration of the evaluation.

Finally, both parties agree that the BIA erred when it found that the Cooper memo could have been presented

prior to the close of evidence. The BIA erroneously stated that the memo was dated June *2000*, however, a closer look reveals that the memo is dated "June *2001*." The memo was therefore clearly not available prior to the close of evidence. However, this memo was intended to cast doubt on the investigation outlined in the Susser memo and is therefore no longer material because we have already held the Susser letter to be untrustworthy and its use a violation of Ms. Obianuju's due process rights. As the memo is no longer material, we will not require the IJ to consider it.

## III.

The BIA violated Ms. Obianuju's due process rights by resting its credibility determination almost entirely on the unreliable and untrustworthy Susser letter. In addition, the BIA abused its discretion by refusing to reopen the record and remand to the IJ for it to consider a material psychological report. We will not assess Ms. Obianuju's entitlement to relief based on the record as we have required it to be modified by this opinion because the agency should have the opportunity to do so. *See INS v. Ventura*, 123 S. Ct. 353, 356 (2002). We will therefore remand to the BIA for further proceedings regarding Ms. Obianuju's petition without reliance on the Susser letter and aided by the additional psychological evaluation. Accordingly, we will GRANT the petition for review, and REMAND this case to the BIA for further proceedings consistent with this opinion.

## Appendix
## Susser Letter

Bureau of Democracy,
Human Rights and Labor
August 7, 2000

NAME:       Obianuju, Glory
A #:        76 142 746
COUNTRY:    Cameroon

Irene Feldman
Assistant District Counsel
U.S. Department of Justice
Immigration and Naturalization Service
Elizabeth, NJ 07201

Dear Ms. Feldman:

I am writing to forward the results of an investigation, by a Foreign Service post, of documents presented in support of the asylum application of the above-named individual. These documents were forwarded to us by your office.

Regarding the Medico Legal Certificate, the Director of Administrative affairs in the Provincial Hospital of Bamenda stated that the round form and the stamp used for the Certificate are fake, and that there is no medical record at the hospital for Glory Obianuju. He also noted that no doctor by the name of James N. Chefor has ever worked at the hospital. The investigator in the U.S. Embassy in Yaounde, Cameroon, concluded that this document is fraudulent.

Regarding the affidavits dated October 22 and November 15, 1999, the president of the High Court of Bamenda stated that the round stamp and the Commissioner for Oaths stamps are fake. He further stated that neither affidavit had been registered or sworn in the High Court of Bamenda. It is the Embassy investigator's conclusion that this document is fraudulent.

It is the Embassy investigator's conclusion that arrest warrant and application for bail documents are also fraudulent. The arrest warrant lacks key information such as the charge number and dates of appearance and time.

The application for bail was allegedly signed by an individual who has never served as president of the court.

We hope that this information is helpful. If we can be of any further assistance. Please do not hesitate to contact us.

Sincerely,

Marc J. Susser
Director
Office of Country Reports and
Asylum Affairs

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*