

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-31-2007

# Gauwi v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3980

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Gauwi v. Atty Gen USA" (2007). *2007 Decisions.* Paper 1723.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1723

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 05-3980 and 05-5165
_____

SUSANNA GAUWI;
KASUNA GAUWI,

Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES;
SECRETARY OF DEPARTMENT OF HOMELAND SECURITY,

Respondents
_____

On Petition for Review from the
Orders of the Board of Immigration Appeals
(Board Nos. A79 328 707 and A79 328 708)
Immigration Judge:  Rosalind K. Malloy
_____

Submitted Under Third Circuit LAR 34.1(a)
January 9, 2007

Before:  McKEE, AMBRO and FISHER, *Circuit Judges*.

(Filed: January 31, 2007)
_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Susanna Gauwi and her husband Kasuna Gauwi seek review of a July 25, 2005

order of the Board of Immigration Appeals ("BIA") dismissing their appeal and the BIA's

October 28, 2005 order denying their motion for reconsideration and reopening. Because

we conclude that their asylum application was not timely filed and that the BIA's decision

was supported by substantial evidence, we will deny their petition for review.

I.

As we write only for the parties, we will forgo a lengthy recitation of the factual

and legal background to this case. The Gauwis are ethnic Chinese and practicing

Christians who are natives and citizens of Indonesia. In August 2001, the Immigration

and Naturalization Service[1] issued a Notice to Appear, charging them with being subject

to removal under INA § 237(a)(1)(B) for remaining in the United States longer than

permitted. The Gauwis conceded removability, but requested asylum, withholding of

removal, and protection under the Convention Against Torture ("CAT").

At the removal hearing before the Immigration Judge ("IJ"), Susanna testified

about her experiences in Indonesia. In the mid-1980s, according to her testimony, she

was accosted by a group of people while she was walking home from church. They threw

_____

[1]The Immigration and Naturalization Service ("INS") ceased to exist in 2003.
Pursuant to the Homeland Security Act of 2002, the enforcement functions of the INS
were transferred to the Department of Homeland Security, Bureau of Immigration and
Customs Enforcement. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 441,
116 Stat. 2135, 2192.

her bible onto the ground and told her that "Muslim," not Christianity, was the "correct way." They also ridiculed her for being Chinese, and stole her wallet, money, and jewelry. Although there were others around when this incident occurred, no one helped Susanna.

In May 1998, there were riots near Susanna's house in Jakarta. She testified that people stayed in their homes, and shops that were owned by ethnic Chinese were burned. Susanna and her brothers did not leave her house for about a week. Fortunately, they were not injured.

Later that year, Susanna testified that she was riding in a taxi when she was stopped by a group of people. They forced her out of the taxi and commented that she was Chinese. Although they did not harm her physically, they did take her purse. The police did not aid her in the investigation of either robbery, although she was able to wait at a police station after the 1998 incident until it was safe for her to leave.

Susanna and her husband entered the United States on April 5, 2000. They were authorized to remain in the country until April 4, 2001. Susanna explained that she approached an individual to help her file for asylum in March 2001. Despite her claims to have "bothered" this individual every week, the application was not filed until June 4, 2001. Unfortunately, this was after the one-year period had elapsed.

The IJ found that Susanna's application for asylum was untimely, and that she had failed to establish changed or extraordinary circumstances excusing the delay. In

addition, the IJ found that, although there may still be discrimination against ethnic Chinese in Indonesia, conditions were improving and the Indonesian government did not prevent Christians from practicing their religion. Thus, Susanna had not established eligibility for withholding of removal or CAT protection.

As to Kasuna, whose asylum claim was derivative to his wife's claim, the IJ noted that he did not have an application for asylum, withholding of removal, or CAT protection before the court. However, the IJ went on to note that because Kasuna testified that he was never harmed in Indonesia, and was not afraid to return, he had not established any grounds for protection.

In July 2005, the BIA adopted and affirmed the decision of the IJ. The Gauwis filed a motion to reopen and reconsider, which was also denied in October 2005. This petition followed.

## II.

We exercise jurisdiction to review the BIA's final order of removal under 8 U.S.C. § 1252(a)(1) and the Petitioners' constitutional claims under 8 U.S.C. § 1252(a)(2)(D). To the extent that the BIA adopted the findings and reasoning of the IJ, we review the decision of the IJ. *Sukwanputra v. Gonzales*, 434 F.3d 627, 631 (3d Cir. 2006). Insofar as the BIA set forth its own opinion, however, we review its reasoning. *Id.*

The Gauwis first argue that the one-year bar on asylum applications violates the Constitution and treaty obligations of the United States. We review these claims *de novo*.

4

*Id.* Recently, we decided these very issues in *Sukwanputra v. Gonzales*. There, we held that the one-year limitations period did not "conflict[] with Article 34 of 1951 United Nations Convention Relating to the Status of Refugees" because that provision was not self-executing. *Id.* at 631-32. We also "conclude[d] that the one-year statutory limitations period provided in § 1158(a)(2) [and the judicial review bar of § 1158(a)(3)] do[] not violate the Due Process Clause." *Id.* at 632-33.

The Gauwis next challenge the IJ's determination that they did not qualify for an exception to the one-year filing period for asylum applications. Ordinarily, an alien must file an asylum application within one year of arriving in the United States. 8 U.S.C. § 1158(a)(2)(B). However, the IJ may consider an application filed after the deadline if there are "changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application . . . ." 8 U.S.C. § 1158(a)(2)(D).

The Gauwis argue that the proper legal standard for determining whether or not an exception to the filing deadline applies is a "reasonable under the circumstances" test. However, because the Petitioners did not present this argument to the BIA, we do not have jurisdiction to review it here. *See* 8 U.S.C. § 1252(d)(1). Rather, the argument made to the IJ – as well as the substance of the argument made to this Court – is that the Petitioners should be accorded the "benefit of the doubt" in late-filing situations. However, we rejected this standard in *Sukwanputra*, saying that the argument was

5

"wholly without merit." 434 F.3d at 634. In addition, "the absence of intentional conduct on the part of the asylum applicant in creating the circumstances which caused the delay is merely one element that the asylum applicant must prove to excuse a failure to file within the one-year deadline." *Id.* at 635 n.5 (citing 8 C.F.R. § 208.4(a)(5)). It is not, as the Petitioners argue, the complete test to excuse late filing. Thus, we find no error with the legal standard applied by the IJ in determining that the Petitioners were not entitled to an exception to the one-year filing period for asylum applications.

Finally, the Gauwis argue that the IJ erred in finding that no "pattern or practice" of persecution against Chinese Christians exists in Indonesia. Because their asylum petition was untimely and they have not asserted any colorable argument concerning torture, the only claim under which this argument would be relevant is their request for withholding of removal under INA § 241(b)(3). To state such a claim, the Petitioners must demonstrate a "clear probability" that their life or freedom would be threatened upon return to Indonesia on account of a protected ground. *See* 8 U.S.C. § 1231(b)(3); *INS v. Stevic*, 467 U.S. 407, 429 (1984). They may establish this probability, in part, by showing that "there is a pattern or practice in [their] country of nationality . . . of persecution of a group of persons similarly situated to the applicant[s] on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." *Lie v. Ashcroft*, 396 F.3d 530, 536 (3d Cir. 2005) (quoting 8 C.F.R. § 208.13(b)(2)(iii)(A)) (internal quotation marks omitted). This pattern or practice must

6

be "systemic, pervasive, or organized," and the "violence or other harm perpetrated by civilians against the petitioner's group does not constitute persecution unless such acts are 'committed by the government or forces the government is either "unable or unwilling" to control.'" *Id.* at 537 (quoting *Abdulrahman v. Ashcroft*, 330 F.3d 587, 592 (3d Cir. 2003)).

Here, the IJ found that, although there may still be discrimination against ethnic Chinese and Christians in Indonesia, this discrimination does not rise to the level of a pattern or practice of persecution. We believe that this finding is supported by substantial evidence.[2] *See Abdille v. Ashcroft*, 242 F.3d 477, 483 (3d Cir. 2001). While the Petitioners point to some evidence of discrimination, there is substantial evidence in the record such that it does not compel a conclusion contrary to the one reached by the IJ. *Id.* at 483-84 (emphasizing that a "finding must be upheld unless the evidence not only supports a contrary conclusion, but compels it"). The Indonesian government does not prevent the practice of Christianity, and Chinese language books and music are widely available. In addition, the Department of State Reports for 2002, though noting some instances of discrimination and harassment, emphasize that the Indonesian government

---

[2]The Petitioners argue that this claim should be analyzed *de novo* because the IJ employed the incorrect standard by focusing exclusively on the Indonesian government's behavior with respect to Chinese Christians, rather than on private actors. However, the record reveals that the IJ considered a pattern or practice claim and did not limit her consideration to the government's actions, but rather found that the government's actions and policies undermined the Petitioners' claim regarding the pervasiveness of the persecution faced by Chinese Christians in Indonesia.

"officially promotes racial and ethnic tolerance." They describe the government's tolerance of illegal actions against religious groups by private individuals as "occasional[]," rather than as systemic, pervasive, or organized. Indeed, the record contains examples of when the Indonesian government has deployed troops to crack down on extremists,[3] and the Department of State's Human Rights Report for 2002 notes that attacks aimed at Chinese Christians have decreased over past years. Confirming these reports, the Petitioners' families have lived in Indonesia without incident during their time in the United States, and Kasuna testified before the IJ that he did not fear for his safety in returning to Indonesia. In sum, while there is troubling evidence of lingering religious intolerance in Indonesia, we are not compelled to conclude that the IJ erred in determining that there was not a pattern or practice of persecution against ethnic Chinese Christians there.

## III.

For the foregoing reasons, we will deny the Petitioners' applications for review.[4]

---

[3]Many of these extreme examples of religious tension occurred outside of Sumatra, where the Petitioners live.

[4]We also note that, although the Petitioners did not make any specific arguments on these points, we find that the BIA did not abuse its discretion for denying their motion to reopen and reconsider. *See Ezeagwuna v. Ashcroft*, 325 F.3d 396, 409 (3d Cir. 2003). A motion to reconsider requires an applicant to "specify[] the errors of fact or law in the prior Board decision and shall be supported by pertinent authority." 8 C.F.R. § 1003.2(b). A motion to reopen allows an applicant to present new facts where "the evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c). The errors that would allow the Petitioners to avail themselves of § 1003.2(b) are discussed above, and the Petitioners have presented no facts that would qualify them for relief under § 1003.2(c).